IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LLOYD'S OF LONDON SYNDICATE NO. 2987, | § § § | |
| Plaintiff | § § § | |
| vs. | § § | CAUSE NO._____ |
| MIRAMAR PETROLEUM, INC., | § § § | |
| Defendant | § | |

## ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiff, Lloyd's of London Syndicate No. 2987, also known as Brit Syndicate 2987 ("Brit"), files this Original Complaint for declaratory relief pursuant to the United States Declaratory Judgment Act, the Texas Declaratory Judgment Act, and all other applicable law, and in support thereof, would respectfully show as follows:

### I. PARTIES

1.1   The Plaintiff, Lloyd's of London Syndicate No. 2987, also known as Brit Syndicate 2987, whose managing agent is Brit Syndicates Limited, is an insurer transacting business in London, England, with its principal place of business in London, England.

1.2   Brit Syndicate 2987 is a syndicate within Lloyd's of London and is a surplus lines insurer authorized to do business in the State of Texas as Lloyd's of London Syndicate No. 2987.

1.3   The Defendant, Miramar Petroleum, Inc. ("Miramar"), is a Texas corporation residing in Corpus Christi, Nueces County, Texas.

## II. SERVICE

**2.1** Miramar may be served with process by serving its registered agent for service of process as follows:

> John L. Clanton
> Miramar Petroleum, Inc.
> Frost Bank Plaza
> 802 North Carancahua, Suite 1220
> Corpus Christi, Texas 78470

## III. SUBJECT MATTER JURISDICTION

**3.1** Subject matter jurisdiction is proper in this Court pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000. This action also is brought pursuant to the Texas Declaratory Judgment Act, Chapter 37 of the Texas Civil Practice and Remedies Code.

## IV. PERSONAL JURISDICTION

**4.1** This Court has personal jurisdiction over the Defendant because Mirarmar was and is doing business in the State of Texas.

## V. VENUE

**5.1** Venue of this action in this Court is proper pursuant to 28 U.S.C. § 1391 because the Defendant, Miramar, resides within this District and is subject to personal jurisdiction in this District.

## VI. FACTS PERTAINING TO THE UNDERLYING LAWSUIT

**6.1** Miramar has reported a surface blowout that occurred on 15 April 2013 at the Sartwelle No. 1 Well in Jackson County, Texas. According to the investigation, conducted

through BC Johnson Associates, Miramar contracted Nicklos Drilling Co. ("Nicklos") to drill the Sartwelle No. 1 Well on a daywork basis.

**6.2** Reports indicate that the Nicklos Rig No. 1 was moved to the location and the well was spud late on 1 April 2013. After drilling the well to a depth of 1,995 feet by 3 April 2013, a string of 8-5/8 inch surface casing was installed and cemented to a depth of 1,990 feet. Reports indicate that the blowout prevention equipment was then installed and tested on 4 April 2013. After testing the casing to 1,000 psi, drilling operations resumed.

**6.3** The company man on location did indicate his understanding that a formation integrity test had been conducted that indicated the formations below the shoe could withstand 12.3 pound per gallon (ppg) equivalent mud weight. Routine drilling operations continued and the mud weight was incrementally raised to 11.9 ppg by a depth of 8,427 feet.

**6.4** On 15 April 2013, the well was drilled ahead to a depth of 8,638 feet. While drilling to 8,638 feet, a drilling break was encountered and the rate of penetration increased rapidly as was noted by the drilling crew. Instructions were given to check for flow and as part of this process, drilling operations were halted and the pumps were turned off. At this point fluid was noted to be coming from the well and the order was given to shut the well in. The drilling crew therefore activated the annular blowout preventer and the well was shut in at the surface.

**6.5** It was advised that from the time the drilling break was noted up to the time the well was shut in was approximately 7 to 8 minutes. From the time the order was given to shut in the well to when the annular was closed was advised at about 3 minutes (included in the 7 to 8 minute estimate). As such, the duration of flow at surface was limited. The blowout prevention equipment functioned appropriately and no further flow at surface was reported.

**6.6**     After shutting in the well at the surface with the annular blowout preventer, high pressure was noted on the well annulus and reported at 1,500 psi. High density drilling mud was ordered out to the location and 12.3 ppg mud was circulated with the well on choke. The pipe was reciprocated during this period and mud losses were reported. These operations had to be halted after running out of mud. Additional mud was brought to location and these operations resumed with additional mud losses reported. At some point, the pipe became hard to reciprocate and eventually became firmly lodged in the well. It appears that the well packed off or bridged off in the annulus.

**6.7**     A stuck pipe log was run in the well and the log showed the pipe to be stuck at various intervals from 7,340 feet up to 4,290 feet. The annulus pressure was able to be bled off, indicating that the bridging / fill in the annulus was containing the bottom hole pressure. At last report, the well was reported with zero pressure on the backside but with the pipe firmly lodged in the well.

**6.8**     Miramar requested Brit's comments on coverage, and Brit provided its initial response by an email dated 8 May 2013 from Jeff Probyn to Bob Kachnik, to BC Johnson Associates, and others, wherein Brit indicated that based on the facts currently known, it did not appear that there was coverage for the loss.

## VII. THE POLICY OF INSURANCE

**7.1**     Miramar Petroleum, Inc. is the named insured under Certificate No. AMW126397, effected 100% by Brit Syndicate 2987 through AmWINS Brokerage of Texas, Inc. for a period beginning 16 May 2012 and ending 16 May 2013 providing $3,000,000 in coverage for any one occurrence combined single limit including defense expenses subject to a

combined single limit of liability for all coverages with a retention of $50,000 any one occurrence ("the Policy").

## VIII. TEXAS LAW APPLIES

8.1 Article 21.42 of the Texas Insurance Code, entitled "Texas Law Governs Policies," provides that:

> Any contract of insurance payable to any citizen or inhabitant of this state by any insurance company or corporation doing business within this state shall be held to be a contract made and entered into under and by virtue of the laws of this state relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this state, or at the home office of the company or corporation issuing the same.

TEX. INS. CODE ART. 21.42.

8.2. Article 21.42 of the Texas Insurance Code and Texas law apply to the instant coverage dispute because the named insured, Miramar, is a Texas resident. Under Article 21.42, Texas law is applicable to the "contract of insurance payable to any citizen or inhabitant of this state by any insurance company or corporation doing business within this state." TEX. INS. CODE ART. 21.42.

## IX. THE PERTINENT TERMS OF THE POLICIES OF INSURANCE

9.1 Section 3, subsection II of the Definitions section, defines "well out of control," in pertinent part, as follows:

> II. The term *"well out of control"* shall be defined as a Well insured from which and only when there exists an unintended flow of drilling fluid, oil, gas, water, or other substance, either above the surface of the ground or water bottom or emanating from one subsurface depth interval to another subsurface depth interval via the bore of a Well Insured, *and*

    1.    *Which flow cannot be (a) stopped by the use of the equipment on site and/or the blowout preventer*, storm chokes or other equipment required by Clauses 5 and 14 of the Common Conditions; or (b) stopped by increasing the weight by volume of drilling fluid or by the use of other conditioning materials in the Well; or

    2.    Which flow is declared to be out of control by the appropriate Regulatory Authority. ... (Emphasis added).

**9.2**    Section 1A, Well Out of Control, provides as follows:

Underwriters agree subject to the Combined Single Limit of Liability, terms and conditions of this Certificate, to reimburse the Assured for expenses incurred:

(a)    in regaining or attempting to regain control of a Well Out of Control including any other Well which gets out of control as a direct result of a Well Out of Control; and

(b)    in extinguishing or attempting to extinguish (1) fire above the surface of the ground or water bottom from a Well Out of Control or any other Well(s) which are burning as a direct result of a Well Out of Control or (2) fire above the surface of the ground or water bottom which may endanger the Well(s) insured.

**EXPENSES**

Expenses recoverable hereunder shall include costs of materials and supplies required, the services of individuals or firms specialized in controlling Wells(s) Out of Control and directional drilling and similar operations necessary to regain control of the Well(s) Out of Control, including costs and expense incurred at the direction of regulatory authorities to regain control of the Well(s) Out of Control, and other expenses included within Clause 1 of this Section 1A.

**TERMINATION OF EXPENSES**

In any circumstances, Underwriters' liability for expenses incurred in regaining or attempting to regain control of a Well(s) Out of Control shall cease when it becomes a Well Brought Under Control.

### EXCLUSIONS

There shall be no indemnity or liability under this Section for:

a. any loss of or damage to any drilling or production equipment;

b. any loss of or damage to any Well or Wells, or hole or holes;

c. any loss, damage or expense caused by or arising out of delay (including delayed and/or deferred production) and/or loss of use and/or loss of or damage to production (including that due to loss of reservoir pressure) and/or loss of damage to any reservoir or reservoir pressure.

### X. **THERE IS NO COVERAGE UNDER THE POLICY**

**10.1** In the present case, the well was never out of control as defined by the Policy because the flow was immediately stopped by the blow out preventer and by pumping mud into the well.

**10.2** The facts, as they are currently known, are that a drilling break was encountered and the rate of penetration increased rapidly as was noted by the drilling crew. Instructions were given to check for flow and as part of this process, drilling operations were halted and the pumps were turned off. At this point fluid was noted to be coming from the well and the order was given to shut the well in. The drilling crew therefore activated the annular blowout preventer and the well was shut in at surface. From the time the drilling break was noted up to the time the well was shut in was approximately 7 to 8 minutes. From the time the order was given to shut in the well to when the annular was closed was about 3 minutes (included in the 7 to 8 minute estimate). As such, the duration of flow at surface was limited. The blowout prevention equipment functioned appropriately and no further flow at surface was reported.

10.3  In light of the above, Section 1A was never triggered. Since Section 1A was never triggered, neither was Section 1B which concerns redrilling and extra expense.

## XI. CLAIM FOR DECLARATORY RELIEF AND OTHER DAMAGES

11.1  An actual controversy has arisen and now exists between the parties relating to Brit's duty, if any, to provide Miramar coverage for the incident. Declaratory Judgment is, therefore, necessary and Brit requests a declaration of its rights under the Policy.

11.2  Brit has retained the law firm of Plavnicky Kinzel Makowski, LLP to represent it in this action, and Brit has agreed to pay the firm reasonable and necessary attorneys' fees and expenses. An award of these reasonable and necessary attorneys' fees and expenses incurred by Brit would be equitable and just, and Lexington seeks recovery of them pursuant to this declaratory judgment action, pursuant to Section 37.009 of the Texas Civil Practice & Remedies Code, and pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

## XII. CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Lloyd's of London Syndicate No. 2987 respectfully prays that the Defendant be cited to appear herein, and that on final hearing hereof, Lexington Insurance Company be awarded a judgment against the Defendant.

Respectfully submitted,

_____
Chester J. Makowski
Texas State Bar No. 12852950
Federal I.D. No. 15600
Attorney-in-Charge

David J. Plavnicky
Texas State Bar No. 16066100
Federal I.D. No. 9506

PLAVNICKY KINZEL MAKOWSKI LLP
5300 Memorial Drive, Suite 675
Houston, Texas 77007
Telephone: 713.658.1111
Facsimile: 713.658.8253
Email: Makowski@pkmtexas.com
Email: djplav@pkmtexas.com

**ATTORNEYS FOR PLAINTIFF**
**LLOYD'S OF LONDON SYNDICATE NO. 2987**